The first case on the Corolla v. Dockett for today is Agenda No. 13, No. 1, 2, 5, 5, 3, 5, Cheryl Burrell v. The Board of Trustees of the John A. Logan Community College. Mr. Kanika? Is that how you say your name? Bianca. Bianca. You may proceed. I think you're supposed to put something... I already put that on, Your Honor. Thank you. Being here early, I got to put it on first. Thank you very much. I personally am very pleased that we are reconvening and being able to discuss our cases in person, live. In 3D, I guess I should say, because others might be live. Good morning, Your Honors. May it please the Court, I am Edward Kianka. I represent the Board of Trustees of John A. Logan Community College. This appeal presents a single issue of law, the interpretation of Section 3B-5 of the Illinois Public Community College Act, which is at page 2 of our brief. The specific issue is whether that section prohibits a community college from hiring a part-time adjunct to teach a particular course without first offering to reappoint or reinstate a laid-off or tenured faculty member who is competent to teach that course and who is also within Section 3B-5's two-year recall period to a full-time faculty position. The standard of review is de novo. As to this issue, Section 3B-5 is ambiguous. This Court has held that when statutory language is capable of being understood by reasonably well-informed persons in two or more different ways, it is ambiguous. And in this case, and in the Bigeum case, I'm never sure how to, I haven't found out how to pronounce Bigeum, whether it's soft or hard G. So Bigeum feels better. So unless somebody corrects me, I'll just use that. That's a very important case in this appeal. In this case, and in the Bigeum case, a total of eight judges considered this issue. Four ruled our way. A fifth, the trial judge below, ruled in our favor because he was required to do so by the Bigeum case. And two appellate justices below and the Bigeum trial judge held for the plaintiffs. Since Illinois judges must be presumed to be reasonably well-informed persons, the language in question must be ambiguous. Our argument has three main points. First, the Bigeum court correctly interpreted Section 3B-5 in a case identical to ours on this issue. Second, the appellate court misapprehended the relationship between the two clauses of the last sentence of that section. Third, this court should apply the well-settled judicial construction doctrine, and that will be decisive. I would like to address that last point first. In 1989, two years after the Bigeum decision, the Illinois General Assembly amended Section 3B-5, adding certain language not pertinent here. The amendment made no change to the part of Section 3B-5 involved in the Bigeum case and in this case. Under the judicial construction doctrine, when the legislature amends a statute, in this case the very section that was judicially interpreted a certain way and leaves unchanged the portion of the statute that was judicially construed, it will be presumed that the legislature adopted the court's prior construction. We have cited in our brief a number of decisions by this court applying that doctrine. There is no reason not to apply it here. In fact, this is the perfect case in which to apply it. Bigeum has been the unquestioned law of Illinois for 32 years, almost a third of a century. Illinois has 48 community colleges. According to the Illinois Community College Board website fact sheet, it is the third largest community college system in the nation. Sixty percent of all students in Illinois enrolled in public higher education are enrolled in community colleges, and yet community colleges only receive 25 percent of the funding for public higher education in Illinois. These colleges have all been operating for 32 years under the interpretation of Section 3B-5 adopted in Bigeum. If the Bigeum court decision was incorrect or if it was perceived as incorrect, surely someone would have noticed by now. The interpretation for which we argue here stood without challenge for 30 years. This is why the judicial construction doctrine applies with special force in this case. Counsel, may I ask you a general idea? Does that principle hold true for cases arising in the appellate court or only for cases that came from this court? It applies to cases in the appellate court as well. Your Honor, in our reply brief, we've cited a number of those cases by this court in which the judicial construction was by the appellate court. And I don't have the page reference, but with respect to each citation, I placed an A after the citation to indicate that the decision was the decision of the appellate court. This court has never made a distinction between decisions construing the statute by this court and constructions by the appellate court. In addition, appellee has argued that it's only one decision. But we've cited cases in our reply brief in which only one or two decisions were judicially – were the decisions that judicially construed the statute. And this court applied the rule in that case. To cite one of the examples of the cases we've cited, this court used strong language in the Pilate case. It says, whereas here the legislature has acquiesced in a judicial construction of the law over a substantial period of time – that's what we have here – the court's construction actually becomes part of the fabric of the law. And a departure from that construction by the court would be tantamount to an amendment of the statute itself. It is beyond the power of the appellate court to amend the statute. Counsel, do we know to what extent Bigeum in the 33 years has informed community college employment practices? There's nothing in the record on that, Your Honor. We can only speculate as to that. But as I say, this is the first case since Bigeum that has challenged that result. If this court were to find that the plain unambiguous language – or sorry, that the language of the statute was unambiguous and favored the plaintiffs, would we be bound by the judicial construction doctrine? No, no, Your Honor. You're not bound by it, of course. This court could reexamine that issue. But I would say that the court's decision is to pick the most reasonable, the most plausible interpretation of the statute. Of course, there's more than one. We know that from the conflict in the decisions. But this court will pick the interpretation that it thinks is the most plausible, the most reasonable. If the court is wrong, the remedy is with the legislature. The legislature can amend the statute and overrule, in effect, any decision by this court. So that's the posture of the case. Now, in the alternative to the judicial construction rule, the Bigeum decision's construction of Section 3b-5 was correct. In construing an ambiguous statute, and I think we have established that it is ambiguous, a court's task is to select the most plausible, the most reasonable interpretation. Bigeum has an excellent analysis which is directly parallel to this case, beginning at page 642 of that decision. The first rule of statutory construction is a statute must be considered in its entirety. To quote an oft-used phrase, statutory terms cannot be considered in isolation, but must be read in context. What's pertinent in this case is the last sentence of Section 3b-5, which says in the first clause, prior to the semicolon, a retrenched faculty member shall have a preferred right to reappointment to a position Entailing services he is competent to render prior to appointment of any new faculty member. The key words are reappointment and position and faculty member. The Act defines faculty member as a full-time employee regularly engaged in teaching or academic support services. So the right given in this clause is only to bump a new faculty member, that is a faculty member who has been appointed to a position. The second clause is a provisor clause. It covers persons apparently who are not new faculty but are either non-tenured faculty, who by definition are full-time, or another, quote, employee with less seniority. An adjunct instructor does not accrue seniority. Adjuncts cannot acquire tenure. They are not appointed to positions. They have no right or expectation of continued employment. And as the Court said in Digium, the term employee must be given a restricted meaning based on the way it is used throughout, the same way it's used throughout the entire statute. Could you help me with that piece? You've acknowledged in your brief that the purpose of the article was to protect tenured faculty from being replaced in the same full-time position by a junior non-tenured or, you say, less senior tenured teachers. So you acknowledge the purpose of this is to protect the tenured teachers. Yes. From being replaced by we understand that the legislator said the $22,000, as if that's what people would pay today, tenured teachers let go for the $11,000 a year other teachers would be brought in. The way you interpret this, you refer to it as a junior non-tenured or less senior tenured teacher. But, of course, that's not exactly the language that we're talking about here. The language, as you point out, provides that no non-tenured faculty member, and faculty member we all know means full-time teacher, or other employee with less seniority, apparently not a faculty member, not a full-time teacher. So in the system, who are other employees who are not full-time teachers and, therefore, faculty members? That's the problem, Your Honor. We don't know what that means. And that's why we have to look at the statute as a whole. I mean, what the argument is, it means not a full-time teacher, therefore an adjunct teacher. Well, that's the plaintiff's argument, Your Honor. But that's taking that one phrase out of context. The Bidgium Court says we have to use the word employee consistently throughout this statute. And that means someone who has a position. It is questionable whether an adjunct professor is, well, they don't have a position under all of the information we've been able to find. The Bidgium case discusses in detail the difference between adjunct professors. And we've cited another page eight of our brief, the Ellison Community College case. It's an administrative case. But it discusses in great detail the world of difference between adjunct professors, between adjunct instructors, may or may not be called professors, adjunct instructors and regular faculty. And the community colleges, like many other colleges, you know, law schools, many others, use adjuncts. In the Bidgium case, 40 percent of their instructors were adjuncts. These are essential workers for the community colleges. And they bring valuable new perspectives to these courses. I know many judges and lawyers have served as adjuncts in law schools and in community colleges. If this were to restrict their ability to hire adjuncts, then the legislature should have said so. We can't translate a general policy to protect senior and tenured faculty from having more to save money, to translate that to the employment of adjuncts. That's simply foreign to the statute. It's foreign to the legislative history. We've put the entire legislative history of this statute in an appendix to the brief. There's nobody even thought about adjuncts in that context. So just to answer my final question, you're not sure what other employee means, who is not a full-time faculty member. What does that mean? Well, Your Honor, we can only speculate because the legislature, you know, didn't say anything about that. One possibility is that it is a dean or other regular staff member who is qualified to teach a particular course and could be assigned to a position. But in those circumstances, that person already is receiving full-time benefits and accruing seniority. So under that appellate court's reasoning, if a community college, common sense would say, would want to offer a particular course and no full-time faculty could pick it up, would the college then have to offer a course to any qualified faculty member who was laid off during the past two years? I think that's one of the questions. And then create a full-time position for the faculty member with full benefits. If the faculty member was laid off and then comes back, would they have to create a full-time position with the benefits? And I think that would probably be an unreasonable burden on community colleges, wouldn't it? I think that's my argument. If I understand your question, Your Honor. In other words, I included in the brief a hypothetical. Suppose that the community college wanted to offer a particular course, the history of Illinois from 1600 to 1865. And there is an adjunct professor who is qualified to teach that. My question was whether they'd have to first ask a laid-off faculty member. And that's why I'm saying that would be an unreasonable construction of the statute. Because if there's a laid-off or dismissed faculty member who's within that retransfer period who has the competency, they use the word competency to teach that particular course, then would they have to recall that faculty member in preference to hiring an adjunct to teach that course? And if you recall them, then, of course, they have to have a full-time position because they're a faculty member. They get benefits. And according to the Bidjian case, it costs three times as much to employ a regular faculty member. So what I'm suggesting is that's not the reasonable construction of Section 3B-5. It's simply foreign to the consideration here, which was to prevent faculty members, full-time faculty members, from being replaced in the same position by a junior faculty or staff or whoever they would be replaced by. The General Assembly cannot have intended to include adjuncts. The second clause merely adds this additional proviso that a faculty member or other employee with less seniority cannot be reassigned to a dismissed, tenured faculty member's position. The first clause applies to a position entailing services. The word service in the second clause has to be construed in tandem with the first and has to be given the same contextual meaning. If the legislature had intended adjunct professors, who were well-known at that time as well, when this Article 3B was adopted, intended that to be included, then it had to say so. We should not assume or infer that the legislature intended to restrict these academic decisions about who teaches what courses unless the statute clearly and without doubt requires it. Thank you. Thank you, Mr. Penaka. Ms. Haggard. Thank you. May it please the Court, my name is Loretta Haggard and I represent the plaintiff, Appelese, in this case. It's vital for me to be able to communicate to this Court that opposing counsel is mischaracterizing the issue before the Court. The plaintiffs have never claimed that if there's a single course that an adjunct is assigned that a laid-off, tenured faculty member can perform, then the college has to create, out of whole cloth, an entire position for that laid-off faculty member. From the very beginning in this case, we have pleaded that there were enough courses being offered by adjuncts that were previously offered by the plaintiffs themselves, more than enough to fill up their full course loads and to give them their customary overload or extra credit assignments. We have consistently, from the trial court and the Court of Appeals, made the legal argument that what has happened here is that the college laid off the tenured faculty members and then parceled out their own assignments to multiple adjuncts. So it's easy to knock down a straw man, but this elaborate hypothetical that the defendant is offering about the history of the college and the 1800s and we'll have to create a position with benefits, that is not the facts of this case. Is there an element of bad faith here that is being alleged? We have not alleged bad faith. I mean, the case was tried on the pleadings. It was on a motion to dismiss, so that was not an element. But under the school code cases that we cited, which understand that's an alternative argument if the statute is ambiguous, but under the school code cases that we believe are the analogs, good faith, bad faith doesn't matter. If what happens is the employer, in those cases a school district, lays off a tenured teacher and divides up their assignments and assigns them to other less senior tenured teachers or probationary teachers, that is an end to the case. It doesn't run around tenure, whether it's in good faith or bad faith. And that's the Pennell case, that's Burke, that's Hagopian, Relf, that whole line of cases. So our claim doesn't depend on whether it was in good faith or bad faith. Let me turn to this question of whether the statute is ambiguous. Biggium did not hold that the statute was ambiguous. It assumed that it was ambiguous because the parties disagreed about it. And that was a fatal mistake, because then it went on to do a bunch of looking to other sources that, other than the text of the statute itself, that it should not have looked at if the statute was unambiguous. And just because the parties in this case disagree about what it means doesn't mean that the statute is ambiguous. The legislature must have intended the phrase, other employee with less seniority, to mean something different than a faculty member, because otherwise it would have just said in the proviso clause, provided that no nontenure faculty member or other tenured faculty member or tenured employee with less seniority, that's how Biggium read it, shall be employed to render a service which a tenured faculty member is competent to render. Biggium read a word into the statute that's not there. The Fifth District below correctly looked to the plain and ordinary meaning of the words employee as someone who works for wages and is less than a managerial level, and looked to the dictionary definition of seniority as a privileged, as a privilege like job security earned by length of service. It is true that there is a general presumption that a proviso modifies the antecedent language that came before it, but that presumption can be overcome. If the language of the statute is clear, and if it's not clear, then we can look to the legislative history. And the legislative history that the defendant provided to the court is very helpful, because it all supports the plaintiff's view of the statute. There was not only the passage from Representative Getty that the Fifth District below relied on, saying it would be unfair to lay off a $22,000-a-year faculty member and replace them with two. That was not the only passage. There was debate back and forth about part-time faculty members in that legislative history, and we've cited it in our brief. So, yes, it's true that part-time adjuncts are not mentioned in, as such, in the Public Community College Act, but in the legislative history, the existence of part-time faculty was very much in the legislators' minds. And there's no reason to believe that when Representative Getty made that comment about replacing one tenured faculty with two, making half as much, that he was only thinking about a less senior tenured faculty member. In addition, the legislative history teaches us that there was a debate among the legislators about whether it was more appropriate to analogize community colleges to higher education, you know, four-year colleges and universities, or whether it was more appropriate to analogize it to K-12 school district. And it was the proponents of this, of the tenure provisions who urged that it be interpreted similarly to the school code cases. And really, both sides say, if this is ambiguous, we should look to the school code cases. They just look to two different lines of cases. And the lines of cases that the plaintiff has looked at, as I've already said, are those where a school district got rid of a tenured teacher position and then divided those assignments out to junior faculty members. So we have an entirely different set of facts, really the opposite of what happened in this case. In Bisham, the courses that had been assigned to the tenured faculty were eliminated. They were no longer offered by anyone. All right? And then the laid-off faculty wanted to bump adjuncts out of courses that were outside their primary areas of expertise, and that they had occasionally taken on in the past. Like a theater professor who had occasionally taught a freshman writing course, or speech 101. And they wanted the college in that case to assemble a whole position for them of courses that, outside their fields, that they had occasionally taught in the past. Those factual distinctions make a big difference. And so I'm going to turn now to the well-settled judicial construction doctrine. So the first point I would make about that is, if the statute is plain and unambiguous, you don't even look to that doctrine at all. It doesn't apply. If this Court decides that the statute is ambiguous, then it must recognize the limited reach of the Bisham decision on its facts, because all it did was say, faculty members' coursework is all eliminated, and they're laid off, a college does not have to cobble together a position for them out of classes that adjuncts are taking. The reason we say in our brief that was not a terribly controversial holding, and you wouldn't have expected the legislature to look at the line of school code cases that the defendant has relied on in their brief. So if the judicial, well-settled judicial construction rule applies in this case at all, the Court must consider the fact that the Bisham decision had a very limited reach. It should be limited to its facts, which are nothing like the facts of the present case. And I would also point out that the Bisham decision, that although it's true the well-settled judicial construction doctrine can be applied to appellate cases as well as to Supreme Court cases, the lion's share of the cases that have been cited by the defendant and the plaintiff in their briefs involved Supreme Court cases or long lines of multiple appellate court cases, Federal cases. Sometimes they involve multiple legislative amendments. So, you know, you can infer more from if there's been a whole history of multiple amendments. Here there's been one amendment on an issue that was completely different. It concerned seniority lists. And that's it. And we, you know, there's no other published cases until now that have presented the facts of this case where tenured faculty were let go and their work was submitted. That's why there was no other tests of Bisham over 30 years. No community college tried this. Or if they did, it didn't make it to the published cases of this Court. So to accept your argument, we would have to say other employee with less seniority means any employee without, even those that are not eligible to gain seniority. Correct. And I mean, less seniority, zero seniority is less than the seniority that any full-time faculty member has. Because even a probationary faculty member during their first three years has a contract for a year. And, you know, they can be non-renewed at the end of the year or they can be renewed. And then at the end of the three years, there's a tenured decision. But even a brand new probationary full-time faculty member has more seniority than an adjunct does. They have none. So to say that zero seniority, I mean, of course that's less than any other seniority. That's what the Fifth District held below. There are two other points that I'd like to make that were really... Excuse me, but what about the finances with regard to it? If the other employee is always going to include another full-time employee, then how does the, doesn't that impact on the college's, junior college's finances if they can't hire someone for less money? Well, we wouldn't be here if the college had not offered all of the plaintiffs' classes through adjuncts. All right? If the college just wanted to offer one or two of each of the plaintiffs' classes, that would not make up a full-time position. And we've never taken the position that the college has to create a full-time position for them. So yes, we think that the college under the statute needs to offer an adjunct class to the professor who taught it, but at the time, it was a full-time position. But that's, we have only claimed that the college has made a choice here to continue offering the same courses, more than enough to employ all of the tenured faculty. And under those circumstances, the Section 3B-5 expresses the legislative priority that the tenured teachers have the right to bump. And yes, that does cost more. But how would they have, be able to have a plan in which to reduce the expenses, if that were the case? Their hands would be tied. Unless they just don't offer that class anymore at all. Well, that is the most obvious course that they could have done. They can get rid of departments. They can get rid of entire swaths of courses. They can, you know, they can choose not to tenure new people. They can choose not to hire new people. They can choose not to allow tenured or even full-time faculty positions to go through attrition. The recall period only goes for two years, remember, so after two years, you know, they could eliminate a set of courses for two years, and then the recall rights are gone. And then they can reoffer it again. I mean, there really are so many choices that are still available to community colleges. And I think it's important to note that there is no evidence in this record about fiscal distress. There is agreement on the facts that the college saved substantial amounts of money by hiring adjuncts instead of the full-time faculty. But there is not a record about financial distress. And it would be inappropriate for the court to be construing the statute in light of assumptions about fiscal stress that's maybe besetting community colleges. The other point I'd like to make is that the dissent in this case is very thin on analysis. Judge Justice Welch, first of all, he claimed that the statute is plain and ambiguous in favor of the defendant. That is a point that even the defendant doesn't argue, and it was not argued in Bisham. So that in and of itself undermines the dissent's opinion. And then the dissent also says that he disagrees that the defendant's construction would evade the purposes of tenure, because the defendant was merely trying to continue to provide education in light of the budget crisis. Again, that is not in the record that there was a budget crisis. The defendant's construction absolutely evades the purposes of tenure, because it would, taken to its logical extreme, allow the college to lay off all tenured faculty and replace them with adjuncts at much lower cost. But then what in the world does, is the purpose of the tenure provisions? I mean, we know through the PIATOC case that looked in turn to the school code cases that the purposes of tenure in the community college is to provide stable education to the students, to attract and retain high-quality caliber, high-quality faculty, and to provide job security. And if a community college could simply decide we're going to get rid of all of our tenured faculty, all of our faculty, all of our full-time faculty, and we're just going to offer through adjuncts, the defendant's construction would allow that. And that would render tenure meaningless. If there are no more questions, I think I'm concluded. Thank you. Your Honor, if I may address the last point first. There's no reason to think that the PIATOC case is a good case. It's a good case. No danger that any college, any public college in Illinois of any level, is going to dismiss all of its faculty and replace them with adjuncts. The community colleges have been operating under the Bidgiam case for a third of a century. That hasn't happened. And it's not going to happen. We know that. By a matter of common knowledge. The faculty is the heart of a college or university. Faculty have offices. Faculty are available to students. Faculty set policies with respect to that particular college or subdivision of that college. It is essential to colleges that they have a strong faculty. And it's only when economic necessity requires that they're going to employ adjuncts to teach courses for which they don't have a strong faculty. There's no room for regular faculty. Going back to the first point, saying that we have mischaracterized the issue, and the issue is whether or not you can replace all of a faculty member's courses with adjuncts. That came as a surprise to us, because that was not the way the issue was framed below. There's an agreed statement of facts in this case at the supplemental record, page four. They state that they're challenging respondents' decisions to lay petitioners off during the 2016-17 school year and employ part-time adjunct faculty to teach courses. The plaintiffs were competent to teach. It didn't say teach all courses. It simply said teach courses. The same in their brief below, their appellant brief below. The issue presented for review, they stated, as whether the adjunct faculty to teach the courses previously taught by the tenured faculty. It didn't say teach all the courses. But in any event, Your Honor, I think that doesn't make any difference. Either the statute applies, that part of the statute applies to adjuncts, or it doesn't. And we say it doesn't. To answer Justice Garland's question about bad faith, however, there's no claim of bad faith. The following year, six of the seven plaintiffs were reinstated to faculty positions. And a year after that, Professor Beiler was reinstated to her position. So they were rehired. And I think that is strong evidence that there is no bad faith in that case. And so the legislative history, I just looked at it again. I don't think it's a bad case. I think it's a good case. I do not see any discussion in the legislative history about part-time faculty. But I will leave that to the Court in looking back over the legislative history. But I say again, that issue was simply not before the legislature. The only policy that we can infer from the legislature is a general policy to provide a uniform system of tenure for community college faculty. There was no discussion and really no perceived intent to regulate down to the level of individual courses. Counsel says that the Bigeum case is distinguishable and should not be relied on. And all we can do there is invite the Court to that case. But they state in Bigeum the issue is whether Section 3B-5 of the community college, et cetera, creates rights for faculty members only with respect to other faculty members or whether such rights may be asserted over part-time instructors as well. And that was the thrust of their analysis. And at the end, they say, we find merit in the Board's argument and conclude that Section 3B-5 does not warrant the right to bump them from certain courses, as opposed to the positions in the college curriculum which are held by them. Bigeum is directly in point, Your Honor. And if you analyze the five, the Court discusses the five professors in the Bigeum case, in every case, the complaint was that they had been laid off, dismissed, but that they had been laid off, dismissed, but that they had courses were being taught by part-time teachers. That was the problem with respect to each of those plaintiffs. Bigeum is not distinguishable. In the record below in the discussions in the briefs, there's some discussion of policy. Well, since we're interpreting a statute, of course, the relevant policy is the domain of the legislature. It's the legislature's policy that the court's task is to say what the statute means or doesn't mean, what it says or doesn't say. But if there is a policy consideration that's relevant to the interpretation issue, it is this. Hiring and staffing decisions may be driven by budget, or they may be driven by enrollment. But decisions as to what courses to offer and who should teach those courses are academic decisions. Academic decisions should be made by academics, not by the legislature. In construing this statute, we ask the court to adopt the interpretation that is not only the most rational, but also that gives community colleges the freedom to manage their resources. We should not presume or infer that the General Assembly intended to regulate the hiring of faculty. The function is to prevent colleges from replacing senior faculty with junior faculty. We should not restrict academic decisions unless the statute without doubt clearly requires otherwise. Thank you. Thank you. Case number 125535. Cheryl Burrell v. Board of Trustees of the John A. Logan Community College is taken under advisement as agenda number 13. Counsel, Mr. Kanika and Ms. Hager, thank you for your arguments this morning.